## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 4:20-CR-21 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE SOLOMON OLIVER JR. |
| vs. | : | |
| | : | |
| OLIVER SMITH, | : | **SENTENCING MEMORANDUM** |
| | : | **FOR OLIVER SMITH** |
| Defendant. | : | |

Defendant Oliver Smith, through undersigned counsel, submits the instant Sentencing Memorandum for the Court's consideration and requests a sentence, as calculated and reviewed pursuant to Title 18, United States Code §§ 3553(a) and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing. Counsel attaches the following Memorandum to assist the Court in fashioning Mr. Smith's sentence.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ Jeffrey B. Lazarus*
JEFFREY B. LAZARUS
Assistant Federal Public Defender
1660 W. 2nd Street, Suite 750
Cleveland, Ohio 44113
Telephone: (216) 522-4856
Facsimile: (216) 522-4321
jeffrey_lazarus@fd.org

Attorney for Oliver Smith

1

## **MEMORANDUM**

**I.     Introduction**

Oliver Smith has a sentencing guideline range of 33 to 41 months, at total offense level 19, Criminal History Category II. For reasons detailed herein, Mr. Smith requests this Court vary and depart downward from his guideline range and impose a sentence of 24 months. This request is based on the facts of the offense, his personal history and circumstances, his military service, and his mental health issues. This request is based on the statutory sentencing factors set forth in 18 U.S.C. § 3553(a), which will yield a sentence that is sufficient but not greater than necessary.

**II.    Legal Standard**

The goals and strictures of federal sentencing are set forth in 18 U.S.C. § 3553, which require courts to impose sentences that are sufficient, but not greater than necessary, to satisfy the purposes of sentencing. In order to achieve this goal, a sentencing court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the Sentencing Guidelines, the need to avoid unwarranted sentence disparities among defendants, the need to provide restitution to any victims of the offense, and the purposes of sentencing. 18 U.S.C. § 3553(a). In *Kimbrough v. United States*, 552 U.S. 85 (2007), the United States Supreme Court held sentencing courts must treat the Guidelines as the "starting point and the initial benchmark" when formulating a reasonable sentence, but also conduct a nuanced assessment of each individual case and the appropriateness of a Guidelines sentence in light of the other factors in 18 U.S.C. § 3553(a). *Kimbrough*, 552 U.S. at 101-08. The United States Code is clear that a wide range of information must be considered:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C § 3661.

### III. Oliver Smith's personal history and characteristics

Oliver Smith's life story is somewhat detailed in the presentence report between paragraphs 40 and 45 of the PSR. Dkt. 20, PageID 78-79. This memorandum now provides additional information regarding his personal history, which is relevant to the § 3553(a) factors in fashioning his sentence. Oliver is a 52-year-old man who developed serious mental health issues after his service in the Army and deployment overseas to war. However, his exposure to tragic events began much earlier.

Oliver was born in 1969 in Philadelphia, Pennsylvania. He never had any contact with his father; he believes his father may still be alive in the Philadelphia area but is not certain. When his mother was pregnant with him, she was pregnant with twins; while Oliver was born healthy, the twin did not survive childbirth. He also had another brother that died as an infant. As a result of these two tragedies, Oliver's mother developed significant mental health issues, which affected her ability to care for Oliver. She had such difficulties raising Oliver by herself that Oliver's great-grandparents ended up take custody of Oliver and raising him. This gave his mother the respite she needed to seek mental health treatment, and she greatly improved. She became so much better, in fact, that she later got married and had two children. Oliver, however, remained with his great-grandparents, because his mother's new husband would not permit Oliver back in the home. Oliver remembers that his stepfather refused to have a "bastard child" around his own children.

Oliver believed his great-grandparents provided a good environment for him to be raised in, but when Oliver was age fourteen, his great-grandparents passed away. His mother and stepfather would not allow him in their home, and Oliver was forced to go into a group foster

home in Philadelphia. This group home was terrible; he was bullied by the other kids, had his belongings stolen, and beaten up a number of times. He remained there until he turned eighteen.

When he turned eighteen, he was released from the group home, and had no family to stay with. He was forced to turn to the streets of Philadelphia and was homeless. It was not long before he was arrested with possession of drugs, for which he received a year in prison. PSR at ¶ 27. Shortly after his release, he enlisted in the United States Army. PSR at ¶ 45. Defense counsel has received and reviewed over 800 pages of Oliver's records from the military, and the records that are relevant to this case are attached as Exhibit A. Oliver entered the Army in 1991 and remained until his honorable discharge in January of 1995. Ex. A, pp. 1-2. The highest rank he received was Specialist E4 "SPC E4." Ex. A, p. 4. In October of 1993, Oliver was deployed to Somalia, where he spent several months. Ex. A, p. 3. The traumas he suffered as a result of his deployment had a significant impact on his mental health.

In the early 1990s, the country of Somalia was engaged in a civil war, which led to the involvement of United Nations peacekeeping forces and eventually the United States military. The apex of this military conflict was in October of 1993 when the United States military failed to apprehend the leader of the opposition. This resulted in the Battle of Mogadishu. Somali forces shot down two U.S. military helicopters, as depicted in the movie Blackhawk Down. Altogether, the battle left 19 dead U.S. soldiers and 73 wounded; there are estimates of 2,000 Somali casualties. Oliver was in the middle of this conflict and personally witnessed terrible events, which is best summarized in the 2011 records from his psychological evaluation by the Veterans Administration. Ex. A, p. 5. Oliver details that while in Somalia, he saw a child beaten to death by other children over food. He saw other adults and children killed during combat conditions. Also, Oliver saw a six-year-old child waving a weapon at him, and while he believed

4

the child was intending to cause him harm, Oliver could not bring himself to shoot the child. Later, that same child killed another member of his squad. Ex. A, p. 5.

When Oliver returned from Somalia to his duty station, he began to suffer mental health issues. He began having flashbacks and nightmares about the things he witnessed in Somalia. He had trouble sleeping, easily became angry, and lost motivation to engage in his duties. He gained weight and did not command the physical fitness that was expected of him. He failed the physical examinations, and in January of 1995, he received an honorable discharge from the Army.

He returned home to Philadelphia, where he joined the National Guard. He remained in the National Guard from 1996 to 2001. PSR at ¶ 45. While enrolled in the National Guard, Oliver also attended classes at the Art Institute of Philadelphia, which he completed and earned his associate's degree in 2001. PSR at ¶ 44. The National Guard allowed Oliver to maintain of the consistency from the military, but underneath he continued to struggle with his mental health issues. He ended up withdrawing from the National Guard in 2001 because he was so overwhelmed and distracted by his mental health issues. He was not receiving any treatment, and his mental health issues were only getting worse.

In 2003 and again in 2004, Oliver was placed in a mental hospital for depression and suicidal ideations; he also spent two weeks in the mental hospital in 2009. Ex. A, p. 6; PSR at ¶ 42. He was ultimately diagnosed with post-traumatic stress disorder (PTSD), schizophrenia, bi-polar disorder, and anxiety. As detailed by the records, Oliver's biggest problem is that his mental health issues resulted in him having serious anger issues. He had trouble controlling his anger and trouble dealing with how to properly react when he got angry. The result was that in 1999 he was convicted for aggravated assault in Philadelphia, and for a theft offense in 2006.

PSR at ¶¶ 29-30. He admits both offenses resulted from him making poor decisions after not being able to control his anger.

To combat these issues, in 2010, Oliver began receiving treatment at the Philadelphia Veterans Administration (VA) hospital. A full psychological assessment was done, confirming Oliver was suffering from bi-polar disorder, anxiety, and depression. He was very paranoid, was having trouble sleeping due to him having anxiety and being hypervigilant, and was only sleeping two hours a night. He was having flashbacks to his combat in Somalia and reliving the terrible things he saw. He maintained all his appointments with his counselors and was placed on medications.

In 2012, he moved to Youngstown and began receiving treatment through the VA in Youngstown. The 644 pages of records from VA show that from 2010 through February of 2020, Oliver was open about his issues and wanted to receive help to better cope. For example, there are numerous records where Oliver tells his therapist how overwhelmed he is and that his anger issues were causing his distress. Ex. A, p. 7. The records detail that Oliver continued to have nightmares and flashbacks from combat and from his childhood, and used them as a "stabilizing and motivating force." Ex. A, p. 8.

These records detail specific goals that Oliver would seek to follow regarding controlling his anger. The records indicate that Oliver was not only committed to improving his mental health status, but he also wanted to better himself as a person, expressing an interest in furthering his education and being more devoted to his family. The records detail that he began praying, reading books, learning about music, and playing musical instruments as a healthy outlet for his mental health issues.

Despite all of Oliver's history and issues, the VA records repeatedly assessed whether Oliver was a risk to himself or a danger to others, finding that he presented a "low risk." Ex. A, pp. 9-10. At no point since he began at the VA in 2010 do the records identify him as a risk to himself or to others. It should also be noted that Oliver was previously married. The VA records include that he and his wife, Petrchann "Patra" Smith, were receiving marriage counseling from a counselor. While Oliver and Patra separated a few years ago, they have remained in contact. Patra Smith has written a letter of support for this Court's consideration, which is attached as Exhibit B. She details how caring of a person Oliver is and asks this Court for leniency.

In February of 2020, Oliver continued to meet with his VA therapist. However, when the COVID-19 pandemic hit, the VA switched their policies, and Oliver began phone sessions with his therapist. This is when things began to change for Oliver.

### IV. Oliver Smith's offense and sentencing guideline range

In March of 2020, Oliver stopped seeing his therapist in person, and his phone appointments with his therapist had much to be desired. Oliver failed to receive the help he needed to make the right choices, and began making the wrong ones. He started dating a female named Holly Anderson, who was a crack addict who was using drugs in Oliver's home. The two were in a relationship for several months and Ms. Anderson moved into Oliver's home. Oliver has been on probation to Portage County for over three years, beginning in 2017, and had not had any violations. PSR at ¶ 31. In fact, he had been completed a drug assessment, which recommended no treatment, and all his drug screens had been negative. He knows, however, that by permitting Ms. Anderson to use and keep drugs in his home, he was in violation of his probation and in violation of the law. Ms. Anderson was also obtaining firearms that she could sell to buy drugs. Her actions made Oliver concerned, and resulted in them having relationship

issues. In August of 2020, Oliver and Ms. Anderson broke up, and he told her to leave his home. Ms. Anderson ended up leaving a gun and a silencer at Oliver's home.

Oliver was aware that Ms. Anderson left the gun and the silencer in his home, and intended on getting rid of them. He planned on throwing them out, but failed to get around to doing so. Ms. Anderson, upset at Oliver for breaking up with her, called Oliver's probation officer and said that he had a gun and a silencer in his home. *See* PSR at ¶ 5. Two days after that phone call, Oliver's probation officer and ATF agents came to Oliver's home to conduct a search. PSR at ¶ 6. Oliver was fully compliant with them, and when they found the gun and silencer in the home, Oliver admitted that even though they did not belong to him, he knew they were there and that he should not have had them in his home.

Agents searched the rest of the home, including the basement. In his basement, they found some arrows, black powder, fireworks, and homemade devices that contained explosive powder and nails, which Oliver had kept in his basement for years. PSR at ¶ 7. Oliver admitted to possessing these items as well. The agents, expressing concern over his possession of these items, asked Oliver if he was a member of "Antifa" or "Black Lives Matter," and asking him if he planned on committing violence towards others. The agents asked him if he had extreme religious views, which he denied as well. Oliver made clear that these items had been in his home for several years, and that he had no intention of using them or ever taking them out of his basement. Oliver said he learned how to make these devices from youtube.

The agents arrested Oliver, and he remained in state custody from October 5, 2020 until he entered federal custody on January 21, 2021. On January 26, 2021, the Magistrate ordered Oliver be detained pending trial. Dkt. 12. On January 28, 2021, a three-count indictment was returned. Dkt. 14. On March 8, 2021, Oliver filed a notice of intent to plead guilty in this case.

Dkt. 18. Oliver still intends to plead guilty at the upcoming hearing, and then will proceed directly to sentencing.

The presentence report details Oliver's sentencing guideline range, to which there is no dispute. Oliver's base offense level for illegally possessing a silencer is 20. PSR at ¶ 15. He receives a two-level enhancement for the items found in his basement. PSR at ¶ 16. He then receives a three-level reduction for his acceptance of responsibility, resulting in a total offense level of 19. Oliver has one criminal history point for his 2016 possession of marijuana conviction, but receives an additional two points, because he was on probation for that case at the time of the instant offense, resulting in a Criminal History Category II designation. The resulting sentencing guideline range is 33 to 41 months.

V.      **Determining the appropriate sentence**

Oliver Smith contends that a sentence within in the guidelines is too great, and that a downward variance or departure is warranted in order to achieve a sentence that is sufficient but not greater than necessary under all the § 3553(a) factors. Oliver requests this Court impose a sentence of 24 months.

Specifically, he requests this Court depart or vary downward based on his mental health issues and the circumstances surrounding his mental health issue. United States Sentencing Guideline § 5H1.3 states:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

The records detailed in this memorandum make clear that Oliver Smith has mental health issues dating back nearly 30 years. While he was deployed to Somalia, Oliver witnessed very traumatic events, including seeing the deaths or several fellow servicemen and citizens of Somalia,

9

including children. These traumatic experiences had a profound effect on Oliver's mental health, which he still suffers from 30 years later. He has depression, bi-polar disorder, PTSD, and anxiety. Collectively, these issues result in him having trouble controlling his anger, paranoia, flashbacks, nightmares, and difficulty coping.

He was hospitalized several times for his issues, but was able to secure treatment through the VA and consistently received treatment for over ten years. During that time, he vastly improved through treatment and his commitment to improving himself. The COVID-19 pandemic, however, disrupted the consistency of his treatment, and culminated in him falling back into making poor choices in this case.

Oliver takes full responsibility for his offense. He does not blame Ms. Anderson or the pandemic for him breaking the law, but merely wants the Court to understand the circumstances he was facing in the time leading up to his offense, and that he believes that if he had been continuing to do in-person therapy appointments, he likely would have made smarter choices in how he conducted himself. In consideration of all these, he asks this Court to grant him a departure is warranted under U.S.S.G. § 5H1.3, or in the alternative grant him a variance below his sentencing guideline range. The totality of his mental health issues, his service to our country, and that had been consistently seeking treatment for the last ten years prior to the instant offense, are all factors that warrant a sentence below his guideline range.

**VI.     Conclusion**

In consideration of the facts surrounding the offense, Oliver's personal history, his military service, and his mental health, he requests this Court grant him a variance and a departure below his sentencing guideline range and impose a sentence of 24 months. Such a

sentence is sufficient but not greater than necessary to achieve the statutory sentencing factors of 18 U.S.C. § 3553(a). He requests this Court recommend that he be designated to FCI Fort Dix.

                                            Respectfully submitted,

                                            STEPHEN C. NEWMAN
                                            Federal Public Defender
                                            Ohio Bar: 0051928

                                            */s/ Jeffrey B. Lazarus*
                                            JEFFREY B. LAZARUS
                                            Assistant Federal Public Defender
                                            1660 W. 2nd Street, Suite 750
                                            Cleveland, Ohio 44113
                                            Telephone: (216) 522-4856
                                            Facsimile: (216) 522-4321
                                            jeffrey_lazarus@fd.org

                                            Attorney for Oliver Smith